# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs July 20, 2011

## STATE OF TENNESSEE v. CHRISTOPHER M. BLACK

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2004A246     Monte Watkins, Judge**

**No. M2010-02176-CCA-R3-CD - Filed December 13, 2011**

The defendant, Christopher Black, was convicted by a Davidson County jury of two counts of aggravated rape, a Class A felony, and two counts of aggravated robbery, a Class B felony, and sentenced to an effective term of fifty years imprisonment. On direct appeal, this court affirmed the convictions but remanded for a resentencing hearing "regarding [the defendant's] sentencing status with respect to the 2005 sentencing act and regarding the issue of consecutive sentencing." *State v. Christopher M. Black*, No. M2007-00970-CCA-R3-CD (Tenn. Crim. App., at Nashville, Feb. 26, 2010). Following a hearing on remand, the trial court, applying the single enhancement factor for prior criminal history, sentenced the defendant to twenty-five years for each count of aggravated rape and to ten years for each count of aggravated robbery. The court further found the defendant to be a dangerous offender and ordered that the two aggravated rapes be served consecutively, but concurrently to the sentences for robbery, again resulting in an effective sentence of fifty years. On appeal, the defendant contends that the trial court erred in the imposition of consecutive sentences. Following review of the record, we find no error and affirm the sentences as imposed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR. and D. KELLY THOMAS, JR., JJ., joined.

Richard L. Tennent, Nashville, Tennessee, for the appellant, Christopher M. Black.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and Roger D. Moore, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## Procedural History

The facts underlying the defendant's multiple convictions, as stated by this court in relevant part on direct appeal, are as follows:

This case stems from a brutal attack upon [L.P.] and [D.B.] beginning in the late hours of February 12, 1999, and ending in the early morning hours of February 13, 1999. [L.P. and D.B.] had been friends for several years. Around 11:30 p.m. on the night of the offense, [L.P.] drove to [D.B.'s] parent's home where [D.B.] lived to borrow a movie. She pulled her vehicle in front of [D.B.'s] home and paged him to come outside. [D.B.] came outside, gave [L.P.] the movie, and sat inside her vehicle to talk. About fifteen minutes later, [D.B.] was getting out of the vehicle when he and [L.P.] saw two men with hoods coming through [D.B.'s] yard.

[L.P.] stated that the two men came around from behind her vehicle, over to the driver's side, and knocked on the window. Neither [L.P.] nor [D.B.] knew the two men. [L.P.] cracked the window, and a revolver was stuck in the window to her temple. The men screamed at [L.P.], "Get out of the car, bitch. Get out of the car bitch." The vehicle was still running, and [L.P.] unlocked the door and opened it. [L.P.] said that a chrome revolver was put to her head. She stated, "[I]t looked like it had a pearl, or like, an engraved handle. Looked more like a collector's gun."

When [L.P.] began to get out of the vehicle, the men pushed her back inside. At this point, she stated that she was in the front seat of her vehicle. [D.B.] had gotten out of the vehicle and was on the ground. The men went through the vehicle and told [L.P.] they wanted her wallet and money. She told them that she only had ten dollars, and they yelled at her for not having more money. The men looked through the truck twice and took [L.P.'s] credit cards.

[L.P.] differentiated between the two men by their skin tone. After the men asked for [L.P.'s] money, [she] stated that the man with the dark complexion demanded that she perform oral sex on him. She testified that he said, "'[Y]ou're going to suck my d***.'" She said that she complied because she had a gun to her head and was terrified. She stated, "It started in the street. He made me get on my knees in the street and perform oral sex. And they both

-2-

switched back and forth between four to six times." Both men forced her to perform oral sex against her will and consent by threatening her with a weapon.

[L.P.] testified that after the men forced her to perform fellatio on them, the man with the lighter complexion said, "'I want to f*** this b****.' And they made [her] pull down [her] pants and bend over in the street. And they took turns raping [her] from behind." When one man was raping her, the other was watching for oncoming cars. After being vaginally raped, [L.P.] was forced back inside the car to perform oral sex. Initially, [L.P.] could not recall if either man ejaculated. However, she later stated that, at some point, one of the men ejaculated in her mouth. She could not recall where she was physically positioned but she gagged, and spit the ejaculate outside the vehicle on the pavement on the street.

[L.P.] recalled that [D.B.] begged the men to stop. The men began to leave, but came back. They ordered [D.B.] to run down the street while they held [L.P.] by her hair at gunpoint. The men then pushed [L.P.], and told her to run and not to look back. [L.P.] found [D.B.] and they ran down the street knocking on doors until someone gave them a phone to call 911. [D.B.'s] father came to pick them up and later took them to the crime scene to wait on the police. When [L.P.] returned to the scene, her vehicle was still there with the four doors open.

At trial, [L.P.] identified photographs from the crime scene. She specifically identified a photograph of the ejaculate that she spit out onto the pavement. . . . She described both men as in their early twenties. She also estimated that the attack lasted around thirty to forty-five minutes. She stated that the men were dressed alike. They wore masks, black jeans and sweatshirts, but one man had on a red shirt and the other a blue shirt. The man with the blue shirt had a dark complexion and the man with the red shirt had a light complexion.

[L.P.] was not missing any of her credit cards, but the men took her ten dollars. She told the police what happened and was given a gynecological examination that night. The police obtained internal vaginal swabs and swabs of her mouth. A black light was placed over [L.P.'s] naked body to determine the existence of any pubic hairs or semen. The police also took [L.P.'s] clothes. [L.P.] stated that she did not discuss what she was going to tell the

police with [D.B.].

[L.P.] recalled that, at some point, the two men took their masks off. However, she could only remember seeing the lighter complected man's face. She and [D.B.] provided the police with a sketch; however, she had no input in the sketch developed by [D.B.]. She stated that she did not remember anything about the man with the dark complexion.

On cross-examination, [L.P.] acknowledged that she had trouble remembering the sequence of events; specifically, whether she was forced to perform oral sex or was vaginally raped first. In regard to the events leading up to the man's ejaculating in her mouth, she said she could not remember whether both men or only one man forced her to perform oral sex. She further conceded that she was unsure if the man with the lighter complexion ejaculated in her mouth. She also admitted that she had previously misidentified a busboy that she saw at a restaurant from a photographic lineup as the man with the lighter complexion. . . .

[L.P.] explained that the attack occurred in a residential neighborhood and that the area was illuminated by the headlights on her vehicle and by various streetlights. She recalled that the inside of the vehicle was illuminated from the dash board. She explained that the men wore masks when they pistol-whipped [D.B.] but took them off during the rape. She had no memory of either man wearing gloves but stated that both men held her credit cards in their hands.

[D.B.] testified and corroborated [L.P.'s] testimony. He explained that when he went outside to meet [L.P.] that night, everyone else inside his house was asleep. He stated that the men took his coat, which contained his wallet and $350. He also had a "stereo face" inside his coat pocket. The men also took his earrings, skull cap, and tennis shoes. He noted that the men had a silver weapon, and he saw one of the men forcing [L.P.] to perform oral sex on him.

[D.B.] also distinguished the men by skin tone and said that the man with the dark complexion had the gun. [D.B.] said the darker complected man, whom he later identified as [the defendant], forcing [L.P.] to perform oral sex on him. [D.B.] confirmed that the man with the dark complexion also hit him in the back of the head with the gun. He went to the hospital and received nine stitches to the head and had a scar as a result. He provided a statement to the

-4-

police and worked on a sketch that same day. . . . When the sketches in this case were developed, [D.B.] and [L.P.] were not in the same room.

[D.B.] identified [the defendant] as the person he saw forcing [L.P.] to perform oral sex on him from a photographic lineup. . . . [D.B.] testified that it was "the eyes" that stood out to him. He said that the man was younger than he, 5'10" tall and 130 pounds. He admitted that he had previously been confused about whether [the defendant] wore a red shirt or a blue shirt but said he was certain of his identification.

On cross-examination, [D.B.] stated that his credit card was used at a gas station and two other stores within thirty minutes of the offense. He conceded that in two prior photographic lineups, he identified another individual as someone who "looked like" the dark complected man. He clarified that in each of those lineups, he told Detective Sutherland that he "wasn't one hundred percent sure" or was "not positive" of the identification. Four years after the initial photographic lineups, [D.B.] was brought in to view another photographic lineup. Detective Sutherland told him he had a possible suspect and that there was a DNA match. [D.B.] testified that when he identified [the defendant] from the photographic lineup, Detective Sutherland told him that he had chosen the person confirmed by DNA analysis.

Tamara Jackson, [D.B.'s] sister, testified that she was at home on the night of the offense. She heard noises outside and heard someone say "Make those 'hos run." She woke her father, went outside, and noticed [L.P.'s] vehicle in front with the doors open and things on top of the roof. There was no one around at the time. She called the non-emergency number, and she and her father closed the doors to the vehicle. She later received a call from a neighbor indicating [L.P.] and her brother were there and had been hurt. She went inside to upgrade her previous non-emergency call to a 911 call.

*Id*. Police investigators also testified at trial regarding their investigation, including the fact that they had collected evidence of bodily fluid off the roadway on the evening of the crime. A nurse practitioner at a Nashville hospital gave testimony regarding the examination conducted on [L.P.] and the results of that testing. She indicted that the report showed areas of contact as the mouth, the vulva, and the vaginal area. *Id*. It was not until August 2003, that a CODIS hit was received by police indicating the defendant as a potential match for earlier generated serology sample recovered from the crime scene. *Id*. After receiving confirmation of a match, the defendant was arrested and subsequently identified in a photographic lineup by [D.B.] as the perpetrator. *Id*.

Based upon these actions, the defendant was indicted by a Davidson County grand jury for two counts of aggravated rape and two counts of aggravated robbery. Following a trial by jury, the defendant was convicted as charged. The trial court subsequently imposed sentences of twenty years for each aggravated rape and ten years for each aggravated robbery conviction. The court ordered that the rape convictions run consecutively to each other but that the robbery sentences would be served concurrently to each other. However, the court ordered the rape and robbery convictions be served consecutively for an effective sentence of fifty years in the Department of Correction. The defendant timely appealed. *Id*.

On direct appeal, a panel of this court affirmed the convictions; however, the case was remanded for sentencing consideration. Namely, the court concluded that the defendant had failed to properly waive the *ex post facto* considerations created by the 2005 amendments to the sentencing act and, further, that the trial court had failed to properly annunciate its findings with regard to consecutive sentencing.

A resentencing hearing was held before the trial court on October 6, 2010. During the hearing, no further proof was presented to the court, but arguments were asserted by each party. The defendant elected to be sentenced under pre-2005 sentencing law, which was applicable as the date the offenses were committed was prior to the amendments. Applying the single enhancement factor of prior criminal history, the trial court imposed sentences of twenty-five years for each count of aggravated rape and for ten years for each aggravated robbery. The trial court also reaffirmed its finding that the defendant was a dangerous offender, thereby allowing imposition of consecutive sentencing. The court then ordered that the two rape convictions be served consecutively but that all other sentences be concurrent, resulting in an effective sentence of fifty years. The defendant has timely appealed that decision.

**Analysis**

On appeal, the defendant's sole contention is that the trial court erred in the imposition of consecutive sentences. On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentence imposed is improper. T.C.A. § 40-35-401, Sentencing Comm'n Cmts; *see also State v. Arnett*, 49 S.W.3d 250, 257 (Tenn. 2001). When a defendant challenges the length, range, or manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that the determinations made by the court from which the appeal is taken are correct. T.C.A. § 40-35-401(d). This presumption of correctness, however, "'is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" *State v. Carter*, 254 S.W.3d 335, 344-45 (Tenn. 2008) (quoting *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991)). "If, however,

the trial court applies inappropriate mitigating and/or enhancement factors or otherwise fails to follow the Sentencing Act, the presumption of correctness fails," and our review is *de novo*. *Carter*, 254 S.W.3d at 345 (quoting *State v. Shelton*, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992); *State v. Pierce*, 138 S.W.3d 820, 827 (Tenn. 2004)).

In conducting a *de novo* review of a sentence, this court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the enhancement and mitigating factors in sections 40-35-113 and 40-35-114; (6) any statements the defendant wishes to make in the defendant's own behalf about sentencing; and (7) the potential for rehabilitation and treatment. T.C.A. § 40-35-210(b) (2003); *see also State v. Imfeld*, 70 S.W.3d 698, 704 (Tenn. 2002).

It is within the sound discretion of the trial court to determine whether an offender should be sentenced to consecutive or concurrent sentences. *State v. James*, 688 S.W.2d 463, 465 (Tenn. Crim. App. 1984). Consecutive sentencing guidelines are set forth in Tennessee Code Annotated section 40-35-115(b), which provides, in relevant part, that a trial court may order sentences to run consecutively if it finds by a preponderance of the evidence that "the defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." T.C.A. § 40-35-115(b)(4) (2006). In *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995), our supreme court set forth additional requirements for consecutive sentencing when relying upon the fact that the defendant is a "dangerous offender." Accordingly, in order to base consecutive sentencing on the dangerous offender category, the trial court must also find that: (1) the term imposed is necessary to protect the public from further criminal acts by the offender; and (2) the term imposed is reasonably related to the severity of the offenses committed. *Id*. at 938. The reasoning behind this requirement for additional findings "arises from the fact that of all the categories for consecutive sentencing, the dangerous offender category is the most subjective and hardest to apply." *State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999).

In ordering the consecutive sentences in this case, the trial court made the following oral findings on the record:

> All right. Well, I remember this case quite well, because of the facts and the circumstances of this case and the fact that we actually tried this case more than once.
>
> This was, in the Court's opinion, a horrific crime, to say the least. The victims were - - were robbed. One victim is raped repeatedly, in the middle of

the street. A weapon was used, that places anyone - - any reasonable person in fear for their lives.

And the Court believes that this was the case here. [The defendant] has a history of criminal convictions, and the Court believes that that is an enhancement factor that can be used.

. . . .

The Court believes that consecutive sentencing is necessary in this particular case. As stated in *Wilkerson*, that - - and - - and in this case . . . "The proof must establish that the terms imposed are reasonably related to the severity of the offenses committed and are necessary, in order to protect the public from further criminal acts by the offender."

In this case, the Court has already enumerated the kinds of crimes that [the defendant] committed. And, if these are not crimes that are severe, the Court doesn't know of any other crime that's severe, other than murder itself.

So, the Court believes that the proof did, in fact, establish that the term imposed was reasonable - - is reasonably related to the severity of the offenses.

On appeal, the defendant first contends that this court must utilize a *de novo* standard with no presumption of correctness because he asserts that the trial court failed to follow the remand instructions and fulfill its obligation to make factual findings with regard to the defendant's status as a dangerous offender. Next, he asserts that, pursuant to *de novo* review, an aggregate sentence of twenty-five years should be imposed. He bases this assertion on six factors: (1) the defendant's sentence was already enhanced to the maximum within the range based on his prior criminal history; (2) the victim was not struck, beaten, or injured; (3) even a twenty-five-year aggregate sentence at 100% would put the defendant well into his fifties before eligible for release; (4) his entire prior felony record was incurred over a two-day period when the defendant was eighteen years old; (5) the defendant has earned a GED and education certificates while incarcerated, has no gang affiliation, and was gainfully employed prior to his incarceration; and (6) an aggregate sentence of twenty-five years would be consistent with sentences imposed in similar rape cases.

Following review of the record, it appears that the defendant is incorrect in his assertion that the trial court failed to follow the dictates of this court to consider and annunciate the required *Wilkerson* factors supporting the conclusion that the defendant was a dangerous offender. Prior to issuing his findings, the court expressly stated on the record

what those two required considerations were.  There can be no question from a reading of the findings that the trial court found that the term imposed was reasonably related to the severity of the offenses committed.  The court was very clear in its findings that the crimes committed were "horrific."  While not as abundantly clear from a reading of the findings, we conclude that the trial court also adequately stated its belief that consecutive sentencing was necessary to protect the public from further criminal acts by the defendant.  The court stated that the defendant has a history of criminal conviction, which had been previously enumerated.  The inference one must take from this statement is that the trial court believed that this previous record of convictions was sufficient to support the finding.  Thus, no relief is warranted.

## CONCLUSION

Based upon the foregoing, the sentencing decision of the Davidson County Criminal Court is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE